UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Kathy Kelsey, | § § § | |
| *Plaintiff,* | § § | |
| | § | Case No. 4:22-cv-02551 |
| v. | § § | |
| Kilolo Kijakazi, Acting Commissioner of Social Security, | § § § § | |
| *Defendant.* | § § | |

## **MEMORANDUM AND RECOMMENDATION**

This appeal from an administrative ruling denying social security benefits was referred to the undersigned judge. Dkt. 4. After carefully considering the parties' briefs, Dkt. 10-13, the record, Dkt. 8, and the applicable law, it is recommended that Plaintiff Kathy Kelsey's Motion for Summary Judgment (Dkt. 10) be granted, and that Defendant Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 11) be denied.

### **Background**

Kelsey filed for social security benefits under Title II, claiming a disability onset date of November 6, 2017. R.94, 97. Her application claimed she suffered from post-traumatic stress disorder (PTSD), anxiety, depression, hypertension, hypothyroidism, migraine, carpal tunnel syndrome, and insomnia. R.97. Kelsey testified that she previously held positions as a liquor

establishment manager, cook (institution), cashier/checker, assistant manager, and retail manager. R.60-67; *see also* R.44.

As relevant here, Kelsey's claimed mental impairments stem from an abusive marriage that she endured for 23 years. R.101, 553. The abuse culminated in a 2005 incident in California when her now ex-husband "put her in a hangman noose and shot her in the head." R.553. Kelsey moved to Texas, where she continued mental health treatment for issues stemming from her domestic violence trauma. *Id.* In 2018, her mental health issues worsened upon receiving word that her ex-husband had been released from prison five years earlier than expected. R.509.

The Commissioner denied Kelsey's application for benefits, both initially and upon reconsideration. R.156-60, 182-85. Kelsey requested a hearing before an administrative law judge (ALJ). R.206-07. After the hearing, the ALJ issued a decision determining that Kelsey is not disabled. R.34-46.

The ALJ first determined that Kelsey met the insured status requirements and had not engaged in substantial gainful activity since the alleged onset date. R.36. At step two, the ALJ concluded that Kelsey suffers from severe mental impairments, namely PTSD, anxiety disorder, and depressive disorder. R.37. But at step three, the ALJ's found that Kelsey's impairments did not meet or medically equal the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. R.37-39.

The ALJ then formulated the following residual functional capacity (RFC) for Kelsey:

> [T]he claimant has a residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to frequent interaction with supervisors, coworkers, and the public; can remain on task at a sustained rate of concentration, persistence, and pace for at least 90% of the workday, i.e., will be off-task up to 10% of the workday; can adapt to frequent changes in work methods and routines; and can have no job tasks primarily resolving complaints or interpersonal conflicts.

R.39. The ALJ then relied on this RFC and testimony from a vocational expert (VE) to conclude Kelsey was not disabled and could perform past relevant work as a cook (institution) and cashier/checker. R.44-45, 76-77. Kelsey's previous managerial positions were unsuitable. R.77.

In reaching this determination, the ALJ deemed persuasive the opinions of State agency medical consultants who assessed Kelsey's physical impairments and deemed them non-severe. R.42. The ALJ found only partly persuasive the opinions of State agency psychological consultants and the opinion of Dr. Corrine Alvarez-Sanders, a psychologist who examined Kelsey's mental status. R.42-44. And the ALJ concluded that the medical opinion of Chelsea Jecmenek, a physician assistant, was unpersuasive. R.43.

Kelsey unsuccessfully appealed the ALJ's decision to the Social Security Administration's Appeals Council, R.1-4, which rendered the decision ripe for this Court's review. *See* 42 U.S.C. § 405(g); *Sims v. Apfel*, 530 U.S. 103, 106-

3

07 (2000) ("[Social Security Administration] regulations provide that, if ... the [Appeals] Council denies the request for review, the ALJ's opinion becomes the final decision.").

## **Standard of Review**

A reviewing court assesses the Commissioner's denial of social security benefits "only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016) (per curiam) (internal quotation marks omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a scintilla, but it need not be a preponderance." *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012) (quoting *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995)). When conducting its review, the Court cannot reweigh the evidence or substitute its judgment for the Commissioner's. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). "Conflicts of evidence are for the Commissioner, not the courts, to resolve." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). But judicial review must not be "so obsequious as to be meaningless." *Brown*, 192 F.3d at 496 (quotations omitted). The court must scrutinize the record as a whole, taking into account whatever fairly detracts from the weight of evidence

4

supporting the Commissioner's findings. *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

## Analysis

### I. Legal framework

"The Commissioner uses a sequential, five-step approach to determine whether a claimant is ... disabled: (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity." *Morgan v. Colvin*, 803 F.3d 773, 776 (5th Cir. 2015) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)) (footnote omitted).

Before moving from step three to four, the ALJ determines the claimant's residual functional capacity, which is used to evaluate steps four and five. *Id.* at 776 n.2 (quoting 20 C.F.R. § 404.1520(a)(4)). "Under this five-step approach, if the Commissioner determines at a prior step that the applicant is or is not disabled, the evaluation process stops." *Id.* at 776 (citing 20 C.F.R. § 404.1520(a)(4)). The claimant bears the burden of proof at the first four steps. *Kneeland v. Berryhill*, 850 F.3d 749, 753 (5th Cir. 2017). At the fifth step, the burden of proof shifts to the Commissioner "to establish the existence

5

of other available substantial gainful employment that a claimant can perform." *Id.* at 753-54.

## II. The ALJ erred in evaluating the medical evidence when formulating Kelsey's RFC.

Kelsey disputes the ALJ's formulation of her mental RFC. *See* Dkt. 10; Dkt. 13. The RFC is a predicate to steps four and five that determines "the most the claimant can do despite [her] physical and mental limitations and is based on all relevant evidence in the claimant's record." *Kneeland*, 850 F.3d at 754 (quoting *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005)).

As her overarching contention, Kelsey challenges the ALJ's decision to discount the assessments of various mental health providers and consultative examiners who evaluated or treated Kelsey's mental impairments. Dkt. 10 at 16-29; Dkt. 13 at 3-6. Among other things, Kelsey maintains that abundant medical evidence controverts the ALJ's conclusion that Kelsey's severe PTSD, anxiety disorder, and depression nevertheless would allow her to sustain her concentration, persistence, and pace for at least 90% of each workday, *see* Dkt. 10 at 22-29—as the RFC ultimately reflects, R.39. According to Kelsey, the ALJ also improperly substituted his opinion for those of mental health experts, thereby failing to develop the record before formulating Kelsey's mental RFC. *See id.* at 29-30.

Throughout her motion, Kelsey asserts that the ALJ's reasoning behind the mental RFC is deficient and unsupported by substantial evidence. *See, e.g.*, Dkt. 10 at 18, 20, 24-26, 29-30, 39. Relatedly, Kelsey identifies numerous instances where the ALJ allegedly mischaracterized certain key medical records and disregarded others. *See id.* at 22-24, 24 n.7. The Commissioner responds that the ALJ properly considered the entire record, resolved conflicting evidence, and formulated an RFC that substantial record evidence supports. *See* Dkt. 12 at 2-3, 7-8; *see also* Dkt. 11 at 4-13.

As explained below, the Court concludes that the ALJ's opinion was not based on substantial evidence. Rather, the opinion mischaracterizes many medical records and belies an impermissible approach of picking and choosing records that fit the ALJ's conclusions.

### A. The ALJ's statement that he considered all the evidence is inconclusive.

As a starting point, the Commissioner emphasizes the ALJ's statement that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." R.39 (invoking 20 C.F.R. §§ 404.1529, 416.929 and SSR 16-3p); *see also* Dkt. 12 at 2 (citing R.39); Dkt. 11 at 4-5 (same). Kelsey responds that this "boilerplate language" does not immunize the ALJ's failure to

consider the record as a whole. Dkt. 13 at 2. Case law confirms that such generic statements do not establish *per se* that the ALJ fulfilled his obligations.

Alone and unsupported, a rote statement that the ALJ considered all evidence does not establish conclusively that substantial evidence supports the ALJ's decision. *See, e.g.*, *Pena v. Astrue*, 2015 WL 10550964, at *9 (S.D. Tex. Dec. 30, 2015) (finding similar "blanket statement" to be "particularly problematic since the ALJ did not weigh or discuss medical evidence that was favorable to Plaintiff"); *see also, e.g.*, *Allison v. Berryhill*, 2018 WL 1274853, at *8 (N.D. Tex. Feb. 16, 2018) ("An ALJ's generic statement that he considered the entire record is not a satisfactory replacement for specific discussion and consideration of evidence that an ALJ must consider and state reasons for discounting."), *adopted by* 2018 WL 1276820 (N.D. Tex. Mar. 9, 2018).

This does not mean that an ALJ must address every piece of medical evidence. *See Hall v. Barnhart*, 31 F. App'x 839 at *1 (5th Cir. 2002) (per curiam) ("The ALJ is not required to recite every scrap of evidence which the claimant considers helpful to her case."); *see also Christian v. Berryhill*, 2017 WL 1134152, at *12 (S.D. Tex. Mar. 27, 2017) (same principle) (citing *Castillo v. Barnhart*, 151 F. App'x 334, 335 (5th Cir. 2005) (per curiam)). But the ALJ also cannot "'pick and choose' only the evidence that supports his position." *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (quoting *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)).

The Commissioner cites *Brunson v. Astrue*, 387 F. App'x 459 (5th Cir. 2010), when asserting that this Court should accept the ALJ's rote statement as true. Dkt. 11 at 5; Dkt. 12 at 2-3. In *Brunson*, however, the court found "no reason or evidence to dispute [the ALJ's] assertion." *Brunson*, 387 F. App'x at 461. As detailed below, *see infra* Part II.B & C, the record provides ample reason to dispute the ALJ's rote statement here.

### B. The ALJ inaccurately summarized significant findings regarding Kelsey's mental impairments.

Kelsey argues that the ALJ inaccurately characterized certain medical evidence. *See* Dkt. 10 at 22-24. In particular, Kelsey asserts that the ALJ referenced portions of some records while disregarding other findings in those records reflecting that Kelsey's mental impairments caused greater impacts on her ability to work. *See id.* The Court agrees.

For example, the ALJ stated that the results from a "July 2018 mental status examination" by Dr. Kimberly Locke fell "within normal limits." R.40 (citing R.456). Kelsey, however, notes that only some parts of this examination were "normal." Dkt. 10 at 22 & n.5, 24 n.7; *see also* Dkt. 13 at 3. The treatment notes reflect that Dr. Locke found signs of abnormality in Kelsey's mood ("Depressed Anxious Angry"), affect ("Constricted"), thought process ("Tangential"), thought content ("Preoccupations/ruminations"), and cognition ("Impairment of Attention/concentration"). R.456.

9

Notably, the ALJ observed that this July 2018 exam assessed Kelsey with a GAF score of 60, which indicated severe depression. R.40 (citing R.458, 463). The ALJ found this score unpersuasive because GAF scores "are no longer used under the DSM-5." R.40 n.1. Conspicuously, however, the ALJ did not acknowledge Kelsey's numerous PHQ-9 assessments in 2018, 2019, and 2020.[1] Unlike the GAF, the DSM-5 *does recognize* PHQ-9 scores. *See Lucero v. Colvin*, 2016 WL 8230654, at *6 n.12 (D.N.M. Aug. 17, 2016) (noting the PHQ-9 is considered "one of the most validated tools in mental health" and offers a "powerful tool to assist clinicians with diagnosing depressing and monitoring treatment response") (quoting *PHQ-9 Depression Scale,* AIMS Ctr., Univ. Wash., https://aims.uw.edu/resource-library/phq-9-depression-scale); *see also* Dkt. 10 at 21-22 & n.4 (addressing the significance of PHQ-9 scores).

The ALJ's stated reason for discounting Kelsey's GAF scores makes it significant that he failed to acknowledge the *relevant* PHQ-9 scores. Indeed, the July 2018 record containing the GAF score that the ALJ deemed unpersuasive also discloses Dr. Locke's assessment of Kelsey with a PHQ-9 of 23—a score indicating severe depression. *Compare* R.458, *with* R.456. These

---

[1] Mental health professionals assessed Kelsey's PHQ-9 in March 2018, R.470; June 2018, R.464, 465; July 2018, R.456; September 2018, R.512; October 2018, R.449, 450; June 2019, R.574; July 2019, R.652, 654, 657, 705, 709, 712; October 1, 2019, R.611; October 29, 2019, R.647; and October 2020, R.755.

10

findings hardly suggest that Kelsey's mental status fell within "normal limits," contrary to the ALJ's conclusion.

As another inaccuracy, the ALJ stated that a November 2019 examination "indicated the claimant's mental status was intact." R.41 (citing R.674). This observation, however, addresses Kelsey's *neurologic* status, *i.e.*, her brain function, and not her mental health. R.674. To the contrary, the same document indicates that Kelsey is forgetful, does not drive, and has severe panic attacks. R.672. And according to the physician, Kelsey's problems "seem to be progressively getting worse." *Id.*; *see also* Dkt. 10 at 13 (citing R.672). The substance of this record refutes the ALJ's characterization.

Yet other findings by the ALJ relied on similarly selective (and thus inaccurate) accounts of medical observations. In one instance, the ALJ described a June 2018 record as indicating that Kelsey's "reported memory loss was attributed to not taking her prescribed thyroid medication." R.40 (citing R.469). But the ALJ omitted the remainder of the cited sentence. In that sentence, the examining physician assistant attributed Kelsey's memory issues to *both* a failure to take medication *and* "the *extreme amount of anxiety and depression* the patient is facing ...." R.469 (emphasis added). By selectively attributing Kelsey's memory loss to a failure to take medicine, the ALJ's decision ignored findings pertinent to Kelsey's mental RFC.

11

Nor are these the only examples. Numerous times, the ALJ's opinion made similarly selective references to information in Kelsey's medical records when making findings crucial to the RFC.[2] *See* Dkt. 10 at 24 n.7. This incomplete account of key medical records skewed the analysis, leading to the conclusion that substantial evidence does not support the mental RFC.

### C. The ALJ singled out some records while disregarding numerous others.

Kelsey also argues that the ALJ improperly "highlight[ed]" certain notations by a physician assistant (PA), Debbie Boettner, who had phone visits with Kelsey during the COVID-19 pandemic in 2020 through early 2021. Dkt. 10 at 24; *see also* Dkt. 13 at 3. The Court agrees the ALJ erred by disregarding conflicting narratives in PA Boettner's treatment notes and contemporaneous records from Kelsey's mental health providers.

The ALJ repeated the following text from PA Boettner's treatment records, quoting it four times:

---

[2] *Compare, e.g.*, R.41 (ALJ asserting that a July 2019 record, R.712, indicates no anxiety and no depression), *with* R.709, 711 (same record states: "Feelings of hopelessness or depression 6-7 days a week"; "sleeping to[o] much 6-7 days a week and loss of pressure from usual activities; little interest or pleasure in doing things 6-7 days a week"; also assessed a PHQ-9 score of 24, indicating severe depression), *and* R.41 (ALJ citing August 2019 record, R.596, 598, to conclude that Kelsey's "mood was mostly stable, energy ok, and significant decreased in symptoms"), *with* R.598 (same record indicates increased depression symptoms, hypervigilance, and difficulty processing trauma), *and* R.43 (citing October 1, 2019 State agency function report, R.378-89, asserting that Kelsey can perform household chores), *with* R.381 (same report indicates that cooking meals takes Kelsey all day, and that she has no desire to complete tasks).

12

> [T]he claimant did not sound to be in acute distress at the time of the exam; she appeared to understand discussion/questions without problems; *she had normal mood*, no tangential thinking or flight of ideas; and, based on conversation, she had no hoarseness, congestion, shortness of breath, or trouble with hearing or speech.

R.41-42 (emphasis added) (citing medical records from April, September, October, November, and December 2020, and January 2021, R.743, 750, 755, 759, 765, 767). The ALJ's heavy reliance on those notations is problematic.

Some of PA Boettner's treatment notes within the same record undermine the ALJ's emphasis on the preceding form language. During the October 2020 exam, PA Boettner assessed Kelsey with a PHQ-9 score of 21, which indicates severe depression. R.755. That notation is printed directly above the form language cited by the ALJ. *Id.*; R.41. PA Boettner also noted Kelsey's "[d]ecreased concentrating ability, nearly every day" and symptoms like "[f]eeling restless or fidgety" and "feelings of hopelessness or depression, nearly every day." R.755. As another example, notwithstanding a formulaic notation that Kelsey exhibited "normal mood," PA Boettner's narrative in a January 2021 record reflects that Kelsey has been "feeling moody." R.737; *see also* R.757 (November 2020 exam noting that Kelsey "saw her therapist yesterday" and "she is feeling exhausted all the time, with poor focus. She is also having trouble integrating information").

Moreover, PA Boettner, who practices family medicine, saw Kelsey primarily to address physical issues and monitor her medications—not to treat

13

her mental impairments. *See, e.g.*, R.741 (Apr. 7, 2020); R.752 (Oct. 14, 2020); R.737 (Jan. 20, 2021). PA Boettner deferred to mental health providers at Bluebonnet Trails (BBT) for some mental health issues. *See* R.744 (adjusting treatment plan after notification from BBT); R.821 (confirming that BBT, not family medicine providers, manages Kelsey's mental health medication).

Yet the ALJ's analysis of medical evidence from 2020 and 2021 relied almost exclusively on PA Boettner's form language while disregarding findings and observations of Kelsey's mental health providers at BBT. *See* Dkt. 10 at 24-25; Dkt. 13 at 3. Far from suggesting that Kelsey had "normal mood," the BBT providers intermittently observed that Kelsey was struggling with depression, anxiety, and difficulty functioning. *See* R.822-23 (May 18, 2020; "more anxious," "feeling depressed" with "problems related to her memory"; affect congruent with depressed and anxious mood); R.824-25 (June 1, 2020; "more depressed," "more irritable," and "more anxious"; affect congruent with depressed and anxious mood); R.826, 828, 832, 835 (June 9, 2020; similar, "mood problems and anxiety"); R.836-37 (July 6, 2020, mood is "depressed and anxious," difficulty with memory and functioning; "does not appear to be making progress"); R.856-57 (July 24, 2020, similar but "more depressed" with "some suicidal thoughts" and "more anxious lately"); R.861 (July 29, 2020, "increased mood instability" and "increased anxiety" with "passive suicidal ideation"); R.865 (Oct. 6, 2020, "increased mood instability" and "increased

14

depression"); R.879 (Nov. 9, 2020, "more depressed" and "more anxious"; "irritable and agitated"; "difficulty focusing and concentrating"); R.885 (Jan. 28, 2021, "depressed mood" and "decreased energy").

The ALJ referenced only two mental health records from BBT, or any mental health professionals, during that same period. *See* R.42 (citing R.881) (November and December 2020); R.42 (citing R.898) (February 2021). His analysis of those records is misleading. Citing treatment notes from November and December 2020, the ALJ stated that Kelsey had improved concentration and less depression. R.42 (citing R.881). But the November record noted Kelsey's "trouble with concentration and distractibility." R.881. And despite improvements observed in December 2020, *id.*, treatment notes just one month later observed that Kelsey's progress was "slow ... as evidenced by continuation" of her mental health symptoms, R.888 (Jan. 28, 2021 record).

The ALJ's selective acknowledgement of medical records evinces that he picked and chose "only the evidence that supports his position." *See Loza*, 219 F.3d at 393. "This concern is even more pronounced in the context of mental illness" because "a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health." *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019); *see also, e.g.*, *Michele G. v. Kijakazi*, 2021 WL 4034064, at \*5 (S.D. Tex. Sept. 4, 2021) (noting that "mental health symptoms fluctuate

15

over time" and concluding that records suggesting four months of improvement was insufficient to show that the claimant could return to work).

Because the ALJ's analysis reflects a failure to consider Kelsey's record as a whole, his decision is not supported by substantial evidence. *See Singletary*, 798 F.2d at 822-23 ("[T]he substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the Secretary's decision. We must consider the record as a whole."); *see also, e.g.*, *Palladina v. Saul*, 2020 WL 2841314, at *7 (S.D. Tex. June 1, 2020) (ALJ's consistent reliance on evidence that failed to reflect the claimant's mental health records was unsupported by substantial evidence).

### III. The ALJ's errors were prejudicial.

When an ALJ's decision is not supported by substantial evidence, a remand is appropriate if the claimant shows the error was prejudicial. *Byrd v. Astrue*, 2009 WL 10705069, at *14 (S.D. Tex. Apr. 2, 2009). "To establish prejudice, a claimant must demonstrate that he or she 'could and would have adduced evidence that might have altered the result.'" *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)). Kelsey has done so.

The foregoing analysis reflects that the ALJ misconstrued or overlooked significant and extensive evidence indicating that Kelsey's mental impairments had, at minimum, a much greater impact on her ability to

16

concentrate, persist, or maintain pace than what the ALJ concluded. *See supra* Part II. The record, taken as a whole, does not indicate that the ALJ fully and fairly considered the medical evidence that affects Kelsey's mental RFC. This error was prejudicial. *See, e.g., Christian*, 2017 WL 1134152, at *12 (failure to consider all relevant evidence when assessing the RFC warranted remand).

The lack of substantial evidence supporting the ALJ's formulation of Kelsey's mental RFC also tainted subsequent steps in the analysis. At the hearing, the vocational expert agreed that someone who would be "off task 15% of the day"—just 5% more frequently than the RFC provides, R.39—could not have maintained competitive employment. R.78. This marginal increase would render unsuitable Kelsey's past work as a cook (institution) and cashier/checker. *See id.* It is therefore "conceivable that the ALJ could make a different administrative decision upon further review." *See Shugart v. Kijakazi*, 2022 WL 912777, at *4 (S.D. Tex. Mar. 29, 2022). Because the ALJ's errors clearly implicate Kelsey's substantive rights, the case should be remanded for further administrative proceedings.

## Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff Kathy Kelsey's Motion for Summary Judgment (Dkt. 10) be **GRANTED**, and that Defendant Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 11) be **DENIED**.

It is further **RECOMMENDED** that the decision of the Commissioner of the Social Security Administration be **VACATED**, and that this matter be **REMANDED** for further administrative proceedings.

**The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.** *Ortiz v. City of San Antonio Fire Dep't*, **806 F.3d 822, 825 (5th Cir. 2015).**

Signed on September 26, 2023, at Houston, Texas.

_____
Yvonne Y. Ho
United States Magistrate Judge